ATTORNEY FOR APPELLANT

Ernest P. Galos
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana



FILED

Oct 20 2020, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Matter of the
Termination of the Parent-Child
Relationship of R.S. (Minor
Child);

T.L. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

October 20, 2020

Court of Appeals Case No.
20A-JT-883

Appeal from the St. Joseph Probate
Court

The Honorable Jason A.
Cichowicz, Judge
The Honorable Graham C.
Polando, Magistrate

Trial Court Cause No.
71J01-1810-JT-143

**Pyle, Judge.**

# Statement of the Case

[1] T.L. ("Father") appeals the termination of the parent-child relationship with his daughter, R.S. ("R.S."), claiming that: (1) the trial court violated his right to due process when it denied his motion for a continuance; and (2) there is insufficient evidence to support the termination. Finding no violation of Father's due process rights and sufficient evidence to support the termination, we affirm the trial court's judgment.[1]

[2] We affirm.

# Issues

1. Whether the trial court violated Father's right to due process when it denied Father's motion for a continuance.

2. Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

[3] The evidence and reasonable inferences that support the judgment reveal that R.S. was born in February 2017. In October 2017, Mother, who was actively using cocaine and who was homeless, left eight-month-old R.S. with friends. When R.S. became ill, Mother's friends took R.S. to the hospital. DCS was notified of R.S.'s hospitalization, removed R.S. from Mother, placed R.S. in

---

[1] R.S.'s mother ("Mother") is not a party to this appeal.

foster care, and filed a petition alleging that R.S. was a child in need of services ("CHINS"). At the time, Father was in the DuComb Center ("the DuComb Center"), which is a St. Joseph County community corrections center.

[4] The trial court adjudicated R.S. to be a CHINS and, in February 2018, entered a CHINS dispositional order. The CHINS order required Father to: (1) maintain stable and suitable housing; (2) maintain stable employment; (3) complete a parenting assessment and follow all recommendations; and (4) participate in random drug screens. After Father failed to comply with the CHINS dispositional order, continued to use methamphetamine, and was arrested in two separate counties, DCS filed a petition to terminate Father's parental rights in October 2018.

[5] Father failed to appear at the April 2019 termination hearing. Father's counsel told the trial court that Father had recently been released from jail and that counsel had expected Father to attend the hearing. DCS "move[d] to default [Father]," and Father's counsel asked the trial court to continue the hearing. (Tr. Vol. 2 at 6). The trial court asked DCS if it was "entitled to default" or "entitled to simply proceed with [its] evidence and – essentially in abstenia." (Tr. Vol. 2 at 8). DCS responded that it was entitled to a default "simply based upon the fact that [Father] was commanded to appear in the summons and didn't[.]" (Tr. Vol 2 at 10). In the alternative, DCS "believe[d] that it c[ould] proceed with an evidentiary hearing without [Father][.]" (Tr. Vol. 2 at 10). Father's counsel again asked for a continuance because he felt "that there ha[d] to be a reason why [Father] [was]n't [t]here." (Tr. Vol. 2 at 10). The trial court

orally granted DCS' motion for default and then asked counsel for DCS if she "wish[ed] to present a prima facie[.]" (Tr. Vol. 2 at 12). Counsel for DCS responded that she did and called DCS Family Case Manager Crystal Vaughn ("FCM Vaughn") to the stand.

[6]     FCM Vaughn testified that following the trial court's February 2018 CHINS dispositional order, Father, who had been living at the DuComb Center, had completed a parenting assessment. However, according to FCM Vaughn, Father had not successfully completed any of the assessor's recommendations, which included parenting classes, a parenting engagement program, and therapy. FCM Vaughn further testified that Father had attended supervised visits with R.S. after Father had been released from the DuComb Center. However, according to FCM Vaughn, those visits ended in October 2018 when Father was arrested during a visit with R.S. in Marshall County. Father's arrest was based on an outstanding St. Joseph County felony warrant for robbery and intimidation for acts that had occurred in August 2018. FCM Vaughn further explained that Father had also been charged with resisting law enforcement in Marshall County based on his actions when the St. Joseph County warrant had been served. FCM Vaughn also testified that Father had tested positive for methamphetamine in June, July, and August 2018, and had never found stable housing or employment.

[7]     In addition, FCM Vaughn testified that Father had been incarcerated on the charges in Marshall County and St. Joseph County until March 2019, just a few weeks before the termination hearing. When Father was released from jail in

March 2019, FCM Vaughn had told him that "his drug screens had been reactivated," but Father had failed to attend a scheduled screen. (Tr. Vol. 2 at 20). When asked whether there was a reasonable probability that the conditions that had resulted in R.S.'s removal or the reasons for her placement outside Father's home would be remedied, FCM Vaughn responded that there was not. FCM Vaughn explained that Father's "life [was] just really unstable. He [did]n't have stable housing, he [did]n't have a stable income. He [had] been incarcerated for at least the past five months of this case." (Tr. Vol. 2 at 29). In addition, FCM Vaughn testified that the plan for R.S. was foster parent adoption.

[8] During FCM Vaughn's testimony, the trial court admitted into evidence Father's drug screen results, which showed Father's positive test results for methamphetamine. The trial court also admitted into evidence court documents that showed that Father had pled guilty to Class C misdemeanor resisting law enforcement in Marshall County in October 2018. In addition, the trial court admitted into evidence documents showing that Father had been charged with Level 5 felony robbery and Level 6 felony intimidation in St. Joseph County for acts that had occurred in August 2018. The documents revealed that Father had pled guilty to the Level 6 felony in St. Joseph County in February 2019. Also during the hearing, Father's counsel cross-examined FCM Vaughn.

[9] Immediately following the hearing, the trial court orally found that FCM Vaughn's testimony was credible and concluded that DCS "ha[d] presented a

prima facie case on each element of the termination petition." (Tr. Vol. 2 at 30). The trial court orally granted the petition to terminate Father's parental rights. That same day, the trial court issued a two-page order terminating Father's parental relationship with R.S. The order did not include any findings of fact or conclusions thereon. The order also stated that Father had been "ordered defaulted." (App. Vol. 2 at 15).

[10] In May 2019, Father filed a Motion to Vacate Default Judgment. The trial court held a hearing on Father's motion in June 2019. Father testified that he had not attended the April 2019 termination hearing because he had been confused about the time of the hearing. According to Father, he had received notice of the termination hearing while he had been in jail. Father further explained that he had lost the notice, and although he had remembered the date of the hearing, he had believed that the hearing was in the afternoon. According to Father, he had arrived at the courthouse on the afternoon of the termination hearing, only to learn that the hearing had been held that morning. Father asked the trial court to vacate the default judgment due to his excusable neglect.

[11] The trial court responded as follows:

> The second term we need to be more clear about is default. This was certainly not a default like we would use in say a small claim where we all showed up, [Father] didn't, DCS moved for a default, and their motion was granted and we moved on. We were here for a while. And the reason we were here for a while is, as [DCS] mentioned, we, [DCS] presented a prima facie case on its petition. Whether a child can even - or whether a

termination petition can even be granted by a default is I think somewhat of an open question. In *In Re Marriage of Henderson*, reported at 453 N.E.2d 310, a 1983 case, from the Court of Appeals, at page 316 in italics it says, the welfare of a child is not a matter of default. And that is why this Court is very reluctant to use the term default. We present a prima facie case, if nothing else. *In re K.D.*, 962 N.E.2d 1249, it's very different than *Henderson*. One, it's a Supreme Court case; two, much more recent. At page 1257 it says, it is critical that DCS properly serve all parties by publication, if necessary. And if the absent parent is not present, a default judgment could be entered. Now, even assuming though that [Father] is father and should be treated as such, and even assuming that the judgment that was entered can be characterized as a default, I agree with [DCS] that he has failed to establish excusable neglect. I understand why he didn't make the inquiries that [DCS] says that he should because the evidence was not that he didn't know when the trial was supposed to occur, and so he had no reason to be asking around as to when it would occur. He thought he knew. He was just wrong. But I find that second case [DCS] cited, *Smith v. Johnston*, to be somewhat persuasive. It says, the judicial system simply cannot allow its processes to be stymied by simple inattention. And that's what happened here. Neglect on such an important matter, understanding and being somewhat sympathetic to the fact that [Father] was incarcerated, things were being moved around a lot, he can't simultaneously claim his clarity about the matter, I knew it was supposed to be at 1:30, while also saying, hey, things are were getting passed around. I have no idea. It's got to be one or the other. So he has established neglect. Not excusable neglect. His motion to vacate the default should be denied.

(Tr. Vol. 2 at 52).

[12]    In June 2019, the trial court issued a written order denying Father's motion to vacate the default judgment. The order provides, in relevant part, as follows: "For the reasons stated more extensively in open court this date, the Magistrate finds that [Father] has failed to establish 'excusable neglect,' and his Motion for Relief should be denied." (App. Vol. 2 at 42).

[13]    In July 2019, Father filed a notice of appeal to which he attached both the trial court's order denying his motion to set aside the default judgment and the April 2019 order terminating Father's parental rights. In his appellate brief, Father argued that the trial court had abused its discretion when it denied his motion to set aside the default judgment and that there was insufficient evidence to support the termination of his parental rights.

[14]    After Father had filed his appellate brief, the State filed a motion to remand the case to the trial court with instructions to the trial court to issue a new termination order containing the findings of fact required by INDIANA CODE § 31-35-2-8. This Court granted the State's motion and dismissed Father's appeal without prejudice in January 2020. In March 2020, the trial court complied with this Court's order and issued nine pages of findings of fact and conclusions thereon in support of its termination of Father's parental rights.

[15]    Father now appeals.

# Decision

Father argues that the trial court violated his due process rights when it denied his motion for a continuance and that there is insufficient evidence to support the termination. We address each of his contentions in turn.

### 1. Denial of Father's Motion for a Continuance

We note that Father first argues that the trial court abused its discretion when it denied his motion to vacate the "default" judgment. However, although the trial court's order referenced a default judgment, the trial court's order was actually a judgment on the merits terminating Father's parental rights. A termination order entered in a parent's absence does not necessarily have to be a default. *See Young v. Elkhart County Office of Family and Children*, 704 N.E.2d 1065, 1069 (Ind. Ct. App. 1999).

Here, the language used by the parties and the trial court resulted in significant confusion as to whether Father was defaulted for failure to appear or whether the trial court issued a judgment on the merits. However, DCS presented the testimony of the DCS family case manager as well as Father's drug screen results and criminal court records. In addition, the trial court ultimately issued findings of fact and conclusions thereon terminating Father's parental rights. Because DCS presented this evidence to support the termination of Father's parental rights, the trial court's judgment was a judgment on the merits.

We further note that we addressed the use of default judgments in termination of parental rights cases in *Young*, 704 N.E.2d at 1065. Therein, we noted that

"default judgments are not favored in Indiana, and they are especially undesirable in the context of divorce or custody proceedings because of the grave importance of the matters decided therein." *Id.* at 1068 (citation omitted). In addition, pursuant to Indiana Trial Rule 55(B), if defense counsel has appeared, the defendant is entitled to three days notice of default. *Young*, 704 N.E.2d at 1068. "The court may, however, proceed to hear evidence and, if a prima face case is established, render the appropriate judgment." *Id.* Such a judgment "regardless of what the [trial] court called it, would actually [be] a judgment on the merits[.]" *Id.* at 1069. Because the trial court's judgment in this case was a judgment on the merits, we need not address Father's default judgment argument.

[20] We will, however, address Father's argument that the trial court violated his right to due process when it denied his motion for a continuance. As the sole authority in support of his argument, Father directs us to *In re Tre.S.* 149 N.E.3d 310 (Ind. Ct. App. 2020). In *Tre.S.*, the trial court initially scheduled the termination hearing for October 1, 2019. However, "the hearing was moved up because the pre-adoptive parents wanted it finalized sooner." *Id.* at 313. On August 6, the trial court rescheduled the hearing for approximately two weeks later, on August 21. On the day of the hearing, Mother's counsel filed an emergency motion to continue the hearing because counsel thought the hearing was still set for October 1 and was at an all-day mediation training. The record was unclear whether Mother's attorney had even been notified of the August 21 hearing date. The trial court denied the motion to continue and held the

hearing without Mother, or her attorney present, knowingly disregarding Mother's due process rights. This Court found that "[b]oth the [trial] court and DCS knew that they were committing due process violations and proceeded with the hearing anyway." *Id.* We therefore reversed the termination order and remanded the case to the trial court for further proceedings. *Id.*

[21] The facts before us are distinguishable from those in *Tre.S.* Here, the trial court did not change the date of the hearing, and there was no emergency motion for a continuance. In addition, Father's counsel was present at the hearing and cross-examined DCS's witness. *Tre.S.* does not support Father's argument, and the trial court in this case did not violate Father's due process rights when it denied his motion for a continuance.

## 2. Sufficiency of the Evidence

[22] Father also argues that there is insufficient evidence to support the termination. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[23]     When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[24]     A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(B)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[25] Here, Father specifically argues that the evidence is insufficient to show that there is a reasonable probability that the conditions that resulted in R.S.'s removal or the reasons for her placement outside the parent's home will not be remedied.

[26] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to

changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of his future behavior. *E.M.*, 4 N.E.3d at 643.

[27] Our review of the evidence in this case reveals that DCS removed R.S. from Mother because of Mother's cocaine use and homelessness. DCS did not place R.S. with Father because he was living in a county community corrections center. After Father had been released from this center in May 2018, Father tested positive for methamphetamine in June, July, and August 2018. Father was also charged with two felonies in St. Joseph County for acts that had occurred in August 2018. He pled guilty to one of the felonies in February 2019. In addition, Father pled guilty in Marshall County to Class C misdemeanor resisting law enforcement in October 2018. Father spent five months in jail before the April 2019 termination hearing. Following Father's release from jail, DCS offered him the opportunity to participate in drug screens, but Father failed to attend a scheduled screen. In addition, Father was unable to secure stable housing or employment during the course of the CHINS proceedings. Father also failed to successfully complete any of the recommendations in his parenting assessment. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in R.S.'s continued placement outside the home would not be remedied. We find no error.

[28] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232,

1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[29] Affirmed.

Kirsch, J., and Tavitas, J., concur.